UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| STEVE WILSON, ) | |
| ) | |
| Intervenor Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:12CV1232 CDP |
| ) | |
| ROBERTSON FIRE PROTECTION ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

The United States has brought suit against Robertson Fire Protection District (the

District), alleging that it retaliated against employee Steve Wilson because he  refused to

engage in discrimination against two African American firefighters and provided

testimony favorable to the firefighters in their discrimination suit against the District.

Shortly after the United States filed its complaint, Wilson moved to intervene as plaintiff,

add his own claims, and add District fire chief David Tilley as a defendant.  I granted his

motion.

The action is now before me on two motions for partial summary judgment.

Defendants seek a judgment that any allegedly retaliatory acts that took place outside the

300-day Title VII filing period or outside the four-year statute of limitations under 42

U.S.C. § 1981 cannot be part of this suit.  Possibly in the alternative, defendants initially

sought summary judgment that Wilson failed to exhaust his administrative remedies as

required by the Missouri Administrative Procedures Act, Mo. Rev. Stat. § 536.010 *et*

*seq.*, and that some or all of the plaintiffs' claims are therefore barred.[1]

Plaintiff United States seeks summary judgment that the District's extension of a

"last chance agreement" governing Wilson's employment was a materially adverse

action; that no rational trier of fact could fail to find a causal connection between the

extension of the LCA and Wilson's protected activity; and that therefore, the United

States has established, as a matter of law, a *prima facie* case that the District retaliated

against Wilson.

For the reasons described below, I will grant in part defendants' motion and deny

plaintiff's motion.

## I.       Summary Judgment Standard

The summary judgment standards are well established, and they do not change

when both parties have moved for summary judgment.  *See Wermager v. Cormorant*

*Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).  In determining whether to grant either

---

[1] It appears that the defendants withdrew their request for summary judgment on this issue in their reply briefs.  *See* Defs.' Reply to Wilson, Doc. 67, p. 7 n.1; Defs.' Reply to United States, Doc. 68, pp. 3–4. As stated below, I will deny as moot this portion of their motion.

party's motion, the court views the facts – and any inferences from those facts – in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant bears the burden of establishing that (1) it is entitled to judgment as a matter of law and (2) there are no genuine issues of material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the movant has met this burden, however, the non-moving party may not rest on the allegations in its pleadings but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmovant, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

## II.    **Background**[2]

### *September 2006 Disciplinary Actions*

Steve Wilson, who is white, began working for the District as a firefighter in 1980. Eventually, he was promoted to battalion chief, a position two ranks below the fire chief. In September 2006, the District took a series of disciplinary actions against Wilson. On September 6, it demoted Wilson to private, the lowest rank of any firefighter within the District. The letter informing Wilson of his demotion, signed by Chief Tilley, states that he would have "no opportunity for advancement in rank for a period of five years."

---

[2] The following facts are undisputed unless otherwise indicated.

(Doc. 43-4.) The District then suspended Wilson twice, on September 11 and September 19. Finally, on September 21, 2006, the District terminated Wilson.

The parties dispute the reasons behind the District's decisions to demote, suspend, and ultimately fire Wilson. Defendants argue that the decisions were motivated by Wilson's violation of District rules and Missouri state law. Plaintiffs contend they were motivated by Wilson's refusal to engage in discriminatory conduct toward two African American firefighters, Ephraim Woods, Jr. and Lamont Downer.

<u>*Last Chance Agreement*</u>

At that time, District employees ranked as battalion chief or below, including Wilson, were represented by the International Association of Firefighters Local 2665: Professional Fire Fighters of Eastern Missouri. Wilson grieved his demotion, suspensions, and termination through the union. In October 2006, Wilson and the District entered into a last chance agreement (LCA). The LCA required Wilson to accept his demotion and suspensions and to "maintain job performance and conduct" in accordance with the District's rules, regulations, policies, and procedures. (Doc. 42-2.) The LCA indicated that it would be reviewed after one year, in October 2007.

The LCA was accepted by the District's Board of Directors, which conditioned its acceptance on Wilson's referral to the Employee Assistance Program for counseling and that he have "no opportunity to serve in any capacity above backup Engineer" or to "bid

for Engineer by seniority"[3] until after the one-year review in October 2007. The Board

declared that those restrictions "may or may not be removed" at the time of the one-year

review. (*Id.*) The three Board members, as well as Wilson and Chief Tilley, signed the

LCA; Wilson thus explicitly accepted the Board's conditions.

Wilson returned to the District under the terms of the LCA, working as a backup

engineer at the rank of private. In October 2007, at the one-year review, the District

extended the LCA until June 2008. The letter informing Wilson of the extension states

that the "primary reason" was "because of not having a reasonable amount of time to

evaluate your performance due to your extensive absences in 2007."[4]

On February 21, 2008, while the LCA was still in effect, Wilson's shift supervisor

conducted an evaluation of Wilson's performance, rating it as "exceeding the

supervisor's expectations on nearly all performance factors." (Doc. 45-9.)

### *EEOC Charge of Discrimination*

A week after the performance evaluation, on February 28, 2008, Wilson filed a

charge of discrimination with the EEOC and the Missouri Commission on Human Rights,

alleging that the District and Chief Tilley had tried to involve him "in a pattern of

discrimination against Black employees of the District." Wilson alleged that his

---

[3] "Engineer" is the term used for the firefighter who drives the fire truck.
[4] Wilson apparently took two months of sick leave in 2007. (*See* First LCA Extension, Defs.' Ex. FF; EEOC Amended Charge Narrative, Defs.' Ex. II, p. 131, ¶ 12.)

demotion, suspension, termination, denial of promotion, and probation with the LCA, which had "been extended for no legitimate reason" were motivated by his association with, and refusal to engage in discriminatory conduct toward, the District's African American employees. In the section marked "Cause of Discrimination Based On," Wilson checked boxes for "race" and "retaliation." In the space marked "Date Discrimination Took Place," Wilson wrote, "Various acts in late 2007" and checked a box marked "Continuing Action." (*See* EEOC/MCHR Charge, Doc. 42-3, p. 2.)

## *Woods and Downer Lawsuit*

Meanwhile, the United States had filed suit against the District, alleging that it had discriminated against Woods and Downer, two African American firefighters, on the basis of their race. As part of that lawsuit, on March 10, 2008, the United States deposed Wilson. During his deposition, Wilson testified that since approximately 1990, he had been acting as the District's computer administrator. He stated that shortly after Woods and Downer had been terminated, Chief Tilley directed him to "go through the two niggers['] computers to find any dirt you can, like porn, or anything you can find, because I'm sure there's something there." (Wilson Dep. 13:1-7, Doc. 42-1.) Wilson testified that he refused because "it just didn't sound right." (*Id.* 17:9.) Defendants dispute that this conversation occurred.

The District's Board of Governors met on March 25, 2008, and discussed Wilson's deposition. The Board concluded that Wilson had lied. The following day, March 26, 2008, District assistant chief Maynard Howell began preparing a document that listed issues with Wilson's job performance from March 3, 2008 to April 6, 2008.

### *Firefighter Training Conference*

During the first week of April 2008, Wilson and other District employees attended a firefighter training conference in Indianapolis. On April 2, before the conference took place, assistant chief Howell emailed Wilson, stating that if Wilson chose to stay in a downtown hotel, rather than the airport hotel the District had booked, he would not be reimbursed for the expense. Wilson went ahead and stayed with his spouse at the downtown hotel. Wilson had done this on prior occasions at similar conferences. (Wilson Aff., Doc. 55-6.) On April 21, Howell sent Wilson another email, stating:

> I told you on two separate occasions not to get a room . . . It is apparent that you chose to ignore my directive to utilize the room that we had reserved for you. This type of action could jeopardize you attending future classes. Also you can consider this a verbal warning for not following my directive to utilize the room that we had reserved. In the event that the Fire District is billed for the two nights that you failed to stay where instructed, further discipline may be warranted. I emailed you on April 2, 2008 with this information, and I also gave you a hard copy of the email . . .

(Doc. 45-15.) At some point before issuing this warning, Howell told the District's Board about this issue.

*Deposition Transcripts*

Later that month, on April 29, 2008, the Board approved a settlement in the Woods and Downer lawsuit. The United States Department of Justice issued a press release about the settlement on May 23, 2008. Sometime later, Chief Tilley directed assistant chief Howell to place the deposition transcripts from the lawsuit in the battalion chief's office, where they were available for review by other District employees. On June 5, 2008, Wilson emailed his battalion chief to ask that the depositions be moved. Once the Board knew the depositions were available for general viewing, it decided to have them moved.

*Boot Incident*

Shortly before that, on June 3, 2008, Wilson had complained to the battalion chief that he had found gravel and dirt in one of his bunker boots. Wilson stated that he had no time to clean out the boot before going on a call, so he waited until afterward, then swept the particles down a firehouse drain. The battalion chief emailed assistant chief Howell and Chief Tilley to inform them of Wilson's complaint, and Tilley directed Howell to conduct an investigation. In a memo to Tilley, Howell stated that he spoke with Wilson and the battalion chief about the incident, as well as to each shift of firefighters about tampering with one another's personal belongings. In that same memo, Howell reported

that he accused Wilson of lying during his deposition.[5]  He concluded his memo by

stating that Wilson was "making a false allegation [about the dirt and rocks in his boot]

based on the lack of evidence that could be documented."  (Doc. 45-8, p. 4.)

On June 10, 2008, the District conducted another review of Wilson's performance,

rating it as "generally meeting supervisor's expectations on most performance criteria,"

one level below the previous review.  (Doc. 45-19, p. 6.)

*Extension of LCA*

On June 30, 2008, Wilson's battalion chief hand-delivered to Wilson two letters

from Chief Tilley, per Tilley's instructions.  One letter alerted Wilson that although the

Woods and Downer deposition transcripts were public and would be made available for

review upon request, the District did "not intend to promote review" and had moved them

to Tilley's office in response to Wilson's request.  In that letter, Tilley thanked Wilson

for bringing the matter to his attention.  The other letter, also signed by Tilley,

indefinitely extended the LCA governing Wilson's employment.  It did not give any

rationale for the extension.

---

[5]  Howell wrote, "I told him that he lied on his deposition about me when I came over and told him to
get whatever information he had on Woods & Downer because we had to provide that to the Justice
Department.  I told him in his deposition that he said I told him to get whatever dirt he could find on
Woods & Downer.  He said the court reporter copied it down wrong because that is not what he said.
We then ended our discussion."  (Doc. 45-8, p. 3.)

*Amended EEOC Charge*

On August 22, 2008, Wilson filed an amended charge of discrimination with the EEOC and the MCHR. He included a narrative describing the allegedly retaliatory actions the District and Chief Tilley took against him in 2006 and 2007. These actions included those I described above, plus several additional incidents.[6]

Wilson also recounted allegedly retaliatory incidents that occurred since his February 28 filing. He alleged that after he gave his deposition, Chief Tilley "gathered all personnel on all shifts and showed all the firefighters" Wilson's February 2008 EEOC charge. He also alleged that he signed up to take a test for an open position of assistant chief/training officer, but no one contacted him about taking the test. The testing did occur, and another firefighter got the job. Finally, he alleged that the firefighters' schedules had been "shifted around" so that he would almost never be allowed to drive the fire truck, which he alleged "represents an opportunity for career advancement."

The parties agree that Wilson was officially removed from the LCA on March 13, 2009.

---

[6] Wilson recounts, among other things, the following: during the October 2006 meeting in Tilley's office in which Wilson signed the LCA, Tilley allegedly stated that if Wilson did not help the younger firefighters as Tilley requested, or did something Tilley did not like, or if Wilson's wife ran for the District's Board of Directors as she was contemplating, "this is you." Tilley then pushed a heavy book off his desk. (*See* Doc. 58-35, pp. 130–31.) Later, after Wilson returned from sick leave in 2007, his "Battalion Chief" letters on the back of his jacket had been torn off and looked unprofessional. In August 2007, Wilson requested to take part in a "fire marshal mentoring program" wherein the retiring fire marshal would mentor his successor. Tilley denied Wilson's request, citing the terms of the LCA.

The United States filed suit against the District on July 11, 2012, bringing one claim of retaliation under Title VII, 42 U.S.C. § 2000e, *et seq.*  In the complaint, the United States alleged that because Wilson had refused to engage in discrimination against Woods and Downer and had provided deposition testimony in their favor, the District had "subject[ed] him to a probationary status, and repeatedly continu[ed] that probationary status, that prevented him from being promoted or using his seniority rights to obtain an Engineer position."  It alleged that even after removing Wilson from the LCA, the District "maintains Wilson on a *defacto* probationary status that prevents or limits his ability to fairly seek promotions or advancement."  (Compl., ¶¶ 37, 39, 41.)

On September 9, 2012, Wilson intervened as plaintiff and filed an additional complaint, adding Tilley as a defendant.  Similarly to the United States, he brought a Title VII retaliation claim against the District.  Wilson also brought a claim against both the District and Tilley for violating 42 U.S.C. § 1981 by engaging in the series of allegedly discriminatory acts that he had described in his amended EEOC charge.  Wilson sought compensatory damages from the District and both compensatory and punitive damages from Tilley.

## III.    Defendants' Motion for Partial Summary Judgment

I will address defendants' motion for partial summary judgment first.  Defendants initially sought summary judgment on three issues: the filing period under Title VII, the statute of limitations under 42 U.S.C. § 1981, and the exhaustion of administrative remedies requirement under the Missouri Administrative Procedures Act, Mo. Rev. Stat. § 536.010 *et seq.*

As defendants have apparently conceded that MAPA does not apply to the claims in this case,[7] I will deny as moot that portion of their motion.  *See also* MAPA, Mo. Rev. Stat. § 536.100 (judicial review provided for persons who exhaust administrative remedies "unless some other provision for judicial review is provided by statute"; MAPA does not "prevent any person from attacking any void order of an agency at any time or in any manner that would be proper in the absence of this section"); *Krohn v. Forsting*, 11 F. Supp. 2d 1082, 1085 (E.D. Mo. 1998) ("As an initial matter, the Court rejects as meritless defendants' unsupported argument that the requirements of Missouri administrative procedure law should be grafted onto plaintiff's federal [FMLA] claim.").

---

[7]  In one of their reply briefs, defendants wrote, "Defendants understand that exhaustion of the provisions of the Missouri Administrative Procedures Act may not be required in order for a plaintiff to file suit under 42 U.S.C. [§] 1981 or Title VII."  In the other, defendants wrote in a subheading: "Defendants' Arguments Made Pursuant to the Missouri Administrative Procedures Act Do Not Apply to the United States."

*A.*    *Title VII Filing Period*

Although not through the procedures contemplated by MAPA, exhaustion of administrative remedies is a prerequisite for filing actions in federal court alleging claims under Title VII. *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994); *see also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974) (Title VII "specifies with precision the jurisdictional prerequisites that an individual must satisfy before he is entitled to institute a lawsuit.").  If an individual also files with an appropriate state or local agency, he has 300 days from the date of an alleged unlawful employment practice to file a discrimination charge with the EEOC. *See Hutson v. Wells Dairy, Inc.*, 578 F.3d 823, 825 (8th Cir. 2009).  He must file an EEOC discrimination charge before proceeding to federal court. *Williams*, 21 F.3d at 222.

In this case, Wilson filed his first EEOC charge on February 28, 2008.  Because he filed with both the EEOC and the applicable state agency, the Missouri Commission on Human Rights, his charge was timely only as to discrete retaliatory acts that occurred on May 4, 2007 or later.[8]

The parties do not dispute this; they only dispute what I should do about it. According to plaintiffs' separate briefs in opposition, as well as an email attached as an exhibit, neither plaintiff is basing any Title VII claim on allegedly retaliatory acts that

---

[8]  Neither the United States nor Wilson is bringing a hostile work environment claim under Title VII. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

occurred before this date. (*See* Docs. 54, p. 3, 54-5, p. 1, 60, p. 4). Defendants argue that I should therefore grant this portion of their motion; plaintiffs believe denying it as moot is the better course of action. I agree with defendants that granting this portion of their motion, as uncontested, is more appropriate. However, in their reply brief, defendants suggest that, by granting the motion, I would bar plaintiffs from "adducing evidence" at trial of events that occurred before the statutory period. This is not so. *See Morgan*, 536 U.S. at 113 (300-day filing period does not bar plaintiffs from using prior discriminatory acts as background evidence in support of a timely claim). Admissibility of evidence is more appropriately addressed at trial or in a motion in limine. In any event, the parties have not briefed, and I decline to decide, any issue of admissibility at this time.

**B.** ***Section 1981 Statute of Limitations***

Section 1981, like Title VII, prohibits employers from retaliating against employees for opposing racial discrimination. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454–55 (2008); *Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1146 (8th Cir. 2012). The Eighth Circuit has held that the retaliation analysis underlying Title VII and Section 1981 claims is the same and that, therefore, courts "may look to Title VII precedent to inform our analysis of the elements under § 1981." *Sayger v. Riceland Foods, Inc.*, 735 F. 3d 1025, 1030 (8th Cir. 2013).

Claims brought under Section 1981 are governed by a four-year statute of limitations. *See* 28 U.S.C. § 1658; *Jackson v. Homechoice, Inc.*, 368 F.3d 997, 999 (8th Cir. 2004). Retaliation claims may be based on either a discrete act of discrimination, such as demotion or termination, or a "continuing violation," such as the provision of a hostile work environment. *See, e.g., Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007). To succeed under either theory, a plaintiff must show that he suffered a materially adverse action. For the purpose of a retaliation claim, an employment action is materially adverse if "a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions." *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). A materially adverse action need not necessarily "affect the terms or conditions of employment," *see Clegg*, 496 F.3d at 928, but it must produce "an injury or harm." *Burlington N.*, 548 U.S. at 67.

If an individual bases a retaliation claim on a discrete act – such as a demotion – that act must have occurred within the four-year period before he brought suit. However, if an individual alleges that he was subject to a hostile work environment, his claim will not be time-barred "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan*, 536 U.S. at 122.

Here, defendants argue that Wilson was – at most – subjected to a series of discrete acts, and therefore may only base his Section 1981 retaliation claim on actions that occurred after August 7, 2008, four years before Wilson moved to file his intervenor complaint in this suit. Wilson, however, contends that his retaliation claim is based on the "cumulative effect of individual acts" that are all part of the same unlawful employment practice. He argues that his employment was governed by the Last Chance Agreement until March 13, 2009, and that having to work under an LCA with no end date "was surely adverse to Wilson and would deter any employee resisting discrimination." Because the continuation of the LCA fell within the four-year statute of limitations governing Section 1981 claims, Wilson believes that under a "continuing violation" theory, he should be able to seek relief for all the allegedly retaliatory acts he suffered.

I disagree. Even assuming all the retaliatory acts are part of the same unlawful employment practice, none of them occurred within the four-year statute of limitations. The continuation of the LCA is the only timely act Wilson mentions, and that is not an act at all. The *decision* to extend an employee's probationary status could constitute a materially adverse action, by itself or in conjunction with other acts. *See, e.g., Bicknell v. City of St. Petersburg*, No. 8:03CV1045, 2006 WL 560167, at *9 (M.D. Fla. Mar. 7, 2006) (extension of employee's probation was arguably adverse because it delayed her promotion). But the mere fact that an employee's probation continued into the four-year

period preceding his lawsuit – without any action whatsoever by the employer – is an *effect* of an allegedly retaliatory act (or series of acts) and not an act in itself.  It cannot support a continuing violation theory.

In *Delaware State College v. Ricks*, the Supreme Court held that the applicable limitations period began to run when the plaintiff was denied tenure, not when his employment was terminated a year later.  449 U.S. 250, 258 (1980).  Termination of employment at the plaintiff's university was a "delayed, but inevitable, consequence of the denial of tenure."  *Id.* at 257–58.  Therefore, the alleged discrimination occurred "at the time the tenure decision was made and communicated" to the plaintiff.  This was the case "even though one of the *effects* of the denial of tenure – the eventual loss of a teaching position – did not occur until later."  *Id.* at 258 (emphasis in original).  Likewise, in this case, the District's decisions to extend the LCA in October 2007 and June 2008 are the relevant acts, not the fact that the LCA remained in place until March 2009.  It is true that the definition of "materially adverse" is broader in retaliation cases than in discrimination cases.  *See Clegg*, 496 F.3d at 928.  But this more expansive definition does not encompass "act."  Maintaining the status quo, without more, is not an act sufficient to support a claim of continuing retaliation.  *See Ricks*, 449 U.S. at 257. ("Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination.");  *DeNovellis v. Shalala*, 124 F.3d 298, 309 (1st

Cir. 1997) (although plaintiff had been reassigned to sham detail and the reassignment had not been remedied by the time the applicable limitations period began, court's focus "is the date the employer made the allegedly discriminatory decision to detail him, even though the decision's effects still persisted after that effective date").

Accordingly, I will grant this portion of defendants' motion for partial summary judgment.

## IV.   Plaintiffs' Motion for Partial Summary Judgment

Plaintiff United States seeks summary judgment that the District's extension of the LCA governing Wilson's employment was a materially adverse action; that no rational trier of fact could fail to find a causal connection between the extension of the LCA and Wilson's protected activity; and that therefore, the United States has established, as a matter of law, a *prima facie* case of retaliation against Wilson.   Absent direct evidence of retaliation, an employee may prove retaliation by using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005).  Under this burden-shifting framework, "an employee has the initial burden of establishing a prima facie case of retaliation."  *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010).  To establish a *prima facie* case, an employee must show: (1) he engaged in protected conduct; (2) he suffered materially adverse employment action; and (3) the

materially adverse action was causally linked to the protected conduct. *Id.* at 1077–78.

Though the *McDonnell Douglas* burden-shifting framework describes additional steps, the United States' motion for partial summary judgment only concerns its initial burden to establish a *prima facie* case.

**A.**     ***Extension of LCA Not Materially Adverse As A Matter of Law***

As described above, an action is "materially adverse" if "a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim" because of it. *Higgins*, 481 F.3d at 589.  In this case, the United States argues that the June 2008 extension of the LCA governing Wilson's employment was, as a matter of law, materially adverse.  The extension limited Wilson's ability to obtain a promotion by including a condition that he have "no opportunity to serve in any capacity above backup Engineer." (Doc. 42-2.)  The United States argues, therefore, that it constituted an "adverse employment action" under even the more stringent standard governing Title VII discrimination (as opposed to retaliation) claims.  *See Clegg*, 496 F.3d at 928–29. According to the United States, because the extension of the LCA affected the terms of Wilson's employment, it must be considered a materially adverse action.

Defendants respond that the extension "*changed nothing* with respect to Wilson's employment status, pay, terms or conditions; it merely continued the *status quo* which had existed between the parties since Wilson voluntarily entered the LCA in 2006."

(emphasis in original).  Further, defendants point out that, according to the terms of the demotion notice Wilson received in September 2006, he already could not seek promotions for a period of five years.

In *Lewis v. City of Chicago Police Department*, a female police officer volunteered to work a security detail for a meeting of the International Monetary Fund.  590 F.3d 427, 436 (7th Cir. 2009).  She considered the detail to be useful training and an opportunity to earn overtime pay.  The defendant police department denied her request.  When defendant moved for summary judgment, the district court found a question of fact about whether its action was "materially adverse."  After a jury trial, the police officer appealed to the Seventh Circuit, arguing that the failure to assign her to the IMF detail was "materially adverse as a matter of law, and so the court should not have posed the question to the jury."  *Id.* at 436.        The Seventh Circuit rejected this argument, holding that the material adversity of any given action is sometimes a question of law and sometimes a question of fact:

> It is true that some cases present obvious examples of materially adverse actions being taken against employees.  For example, courts should not generally task juries with determining whether terminations, demotions or salary cuts are materially adverse actions.  But there are times where the question is not so obvious, and this case presents one of those instances.

*Id.* (holding that there were questions of fact about how much overtime pay and training the IMF detail would really have provided); *see also Burlington N.*, 548 U.S. at 71

(holding that reassignment of job duties was not "automatically actionable" but upholding jury's finding that it was materially adverse in that case).

In this case, there are facts and inferences in dispute that, like in *Lewis*, prevent summary judgment on the issue of whether the extension of the LCA was "materially adverse." For example, Wilson was working under the October 2007 LCA extension when he filed his first EEOC charge, which might tend to show that a reasonable employee would not have been discouraged from filing a discrimination claim while working under the LCA. However, unlike its predecessor, the June 2008 LCA extension was indefinite and did not provide Wilson with any rationale or deadline for review. This might tend to make it more likely that it would discourage a reasonable employee from making a discrimination claim. Further, there is a question of fact about whether the LCA and its extensions superseded the 2006 demotion notice, which might have limited Wilson's opportunities for advancement in the same way the LCA did. In short, I find that when I take both the facts and their concomitant inferences in the light most favorable to the defendants, genuine issues of material fact remain and the United States is not entitled to summary judgment on this issue.

**B.** ***Causal Connection Not Established As A Matter of Law***

Even assuming there were no issues of fact preventing a finding that the June 2008 LCA extension was materially adverse, I could not find that the United States had shown,

as a matter of law, a causal connection between that act and Wilson's protected activities. Again, there are issues of fact – and inferences that may be drawn from those facts – that preclude summary judgment. For example, the parties agree that some three months passed between Wilson's latest protected activity (testifying on behalf of Woods and Downer) and the extension of the LCA. Further, that the LCA would be reviewed in June 2008 was already established. Both of these facts weigh in favor of no causal connection. *See, e.g., Tyler v. Univ. of Ark. Bd. of Trustees*, 628 F.3d 980, 986 (8th Cir. 2011) (no inference of retaliation based on temporal proximity alone when interval is measured in months).

However, "all was not well" during that three-month period between Wilson's deposition and the extension. *Heaton v. The Weitz Co., Inc.*, 534 F.3d 882, 888 (8th Cir. 2008). One of Wilson's superiors began keeping a log of problems with Wilson's employment the day after the District's Board of Governors was informed about the deposition and concluded that Wilson had lied. Seemingly minor incidents, such as Wilson finding gravel in his boot, were reported to the Board during that time, and Wilson received a performance evaluation that – although not negative – was lower than those he had received previously. A reasonable jury could find that "there was a pattern of adverse actions against [Wilson] beginning shortly after [his protected activity] . . . and lasting until" the June 2008 extension. *Id.* On the other hand, a reasonable jury might

weigh this evidence lightly and might ultimately find that the United States has failed to show even an inference of causation. *See Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). In short, the United States is not entitled to summary judgment on the causal connection between Wilson's protected activity and the June 2008 LCA extension.

## C.    **Prima Facie** *Case of Retaliation Not Established As A Matter of Law*

Because the United States has not shown that it is entitled to summary judgment, as a matter of law, on the material adversity of the June 2008 LCA extension or on the causal relationship between Wilson's protected conduct and that extension, it has not shown that it has established a *prima facie* case of retaliation. Therefore, I will deny the third request of its summary judgment motion.

## V.    **Conclusion**

For the reasons stated above, I will grant summary judgment to defendants on the issues of the Title VII filing period and the 42 U.S.C. § 1981 statute of limitations. I will deny as moot defendants' request for summary judgment on the issue of exhaustion of administrative remedies under the Missouri Administrative Procedures Act. I will deny in its entirety plaintiffs' motion for partial summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion for partial summary judgment [#41] is granted in part and denied in part.  Parts I and II are granted.  Part III is denied as moot.

**IT IS FURTHER ORDERED** that plaintiffs' motion for partial summary judgment [#44] is denied.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 16th day of December, 2013.